Maureen McGURL, Dewey Cannella, Richard E. McFeeley, Robert B. Davidson, Joseph Rizzo, Harvey Whille, Michael Kinsora, and Louis Marcucci, as Trustees of the UFCW Local 1262 and Employers Welfare Fund; and Joseph Rizzo, Harvey Whille, Michael Kinsora, Gilbert C. Vuolo, John Polding, and Robert F. Ennis, as Trustees of the UFCW Local 1262 and Employers Health and Welfare Fund, Plaintiffs,

v.

The TEAMSTERS LOCAL 560 TRUCKING EMPLOYEES OF NORTH NEW JERSEY WELFARE FUND, Defendant.

Civil Action No. 94–5176 (MTB).

United States District Court,
D. New Jersey.

April 29, 1996.

Proskauer, Rose, Goetz & Mendelsohn by David W. MacGregor, Clifton, New Jersey and Proskauer, Rose, Goetz & Mendelsohn by Myron D. Rumeld, New York City, for Plaintiffs.

Herbert New & David W. New by Herbert New, Clifton, New Jersey, for Defendant.

### OPINION

BARRY, District Judge.

This case has come before the court on the parties' cross-motions for summary judgment. The current dispute arises out of a series of medical benefits claims filed by four part-time employees who were covered as employee-participants under plaintiffs' funds and who, at the same time, were dependent beneficiaries of the defendant fund. Not surprisingly, each fund contends that, by the terms of its plan, the other is primarily liable for the claims. Thus framed, this case presents a question of first impression in the federal courts regarding the proper resolution, under federal common law, of the conflict between mutually repugnant coordination of benefits or "other insurance" clauses appearing in two self-funded multi-employer benefit plans, both of which are governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.* For the reasons discussed below, defendant's motion for summary judgment will be granted and plaintiffs' motion will be denied.

### I. *Statement of the Case*

The material facts of this case are undisputed. Plaintiffs are the trustees of two self-funded, multi-employer welfare benefit plans of the United Food and Commercial Workers Local 1262 (collectively, the "Local 1262 Funds"), covering the employees of several contributing employers in the supermarket industry. The Local 1262 Funds' plan documents provide, in pertinent part, that

> If a Part-time Member who is a Covered Member ... is also covered under one or more Other Plans, the Benefits payable under this Plan will be coordinated with Benefits payable under all Other Plans. When there is a basis for a claim under this Plan and the Other Plan, this Plan is a

Reimbursement Plan which has its benefits determined after those of such Other Plan.

As this is a Reimbursement Plan for Part-time Members who are Covered Members ... payments will be made after all other sources of coverage have been exhausted.

(Kinsora Aff.Exh. A § 3.14D.) Similarly, the Summary Plan Description states that, with respect to part-time members,

**[T]his Plan is *always* a reimbursement plan;** if you are covered under another medical plan, this Plan will only take effect when the limits of your other Plan have been exceeded. This means that, you can receive benefits from this Plan (in the form of reimbursement payments) only after the other plan pays benefits to the full extent of the terms of that plan.

(Kinsora Aff.Exh. B at 22 (emphasis in original).)

Defendant Teamsters Local 560 Trucking Employees of North New Jersey Welfare Fund ("the TENJ Fund") is also a self-funded, multi-employer benefit plan. Its plan documents contain the following coordination of benefits provision:

In determining whether this plan is primary for a spouse [or dependent] the following will apply:

The Plan covering the patient as an employee or in which the employee is a participant (regardless of whether the Plan deems the patient covered for the particular benefit), will be the primary plan. If the primary plan denies coverage because of the application of a Rule which is unique to that Plan and which is not a rule of this Fund, then this Fund will provide only that coverage which it would have provided if the primary plan had granted primary coverage. This Fund does *not* afford coverage to a participant's dependent who herself/himself is a participant in a Reimbursement or similar plan that affords coverage only if there is no other health/welfare coverage.

(Def.'s Appendix at 41 (emphasis in original).) In an effort to further clarify its coverage, the TENJ Fund sent a letter to its participants containing the following hypothetical:

Mr. ABC is a participant under our Welfare Fund. His spouse works for the XYZ company. Under normal coordination of benefits, Mrs. ABC's medical claims are submitted to her company first. After they pay the claim, in accordance with their Plan, she submits the claim with a copy of the explanation of benefits from her Plan to our Fund showing the amount paid. Our Fund then pays our portion of the claim under the coordination of benefits rule as the secondary payor and pays the difference up to the Fund's allowable amount. However, if Mrs. ABC's XYZ Plan rejects her claim because XYZ says its Plan is a Reimbursement Plan and will not pay claims if there is any other coverage, such as her being covered as a dependent under her husband's plan, *then our Fund will not pay any portion of Mrs. ABC's claim.*

(Def.'s Appendix at 41 (emphasis added).)

Commencing in May of 1993, Susan Armstrong, a part-time employee of ShopRite Supermarkets—a contributing employer to the Local 1262 Funds—submitted medical expense claims to the Local 1262 Funds in the aggregate amount of $243,993.56. (Boas Aff. ¶ 4.) Because Ms. Armstrong's father was a participant in the TENJ Fund, she was also eligible for dependent coverage under that plan. Accordingly, the Local 1262 Funds denied Ms. Armstrong's claims and notified the TENJ Fund that, because the Local 1262 Funds provided only reimbursement coverage for part-time employees, the TENJ Fund was primarily liable for the claims. (Boas Aff. ¶ 5.) Similarly, the Local 1262 Funds received claims from Karen Iler, Esther Owens, and Patricia Kelly, all of whom, like Ms. Armstrong, were part-time employees of contributing employers to the Local 1262 Funds and dependents of participants in the TENJ Fund. The Local 1262 Funds likewise denied these claims and notified the TENJ Fund that it bore primary responsibility.

Like the Local 1262 Funds, the TENJ Fund denied primary liability for the four part-time employees' claims. It reasoned that, because the Local 1262 Funds provided only a reimbursement plan for the part-time

employees, the express terms of the TENJ Fund relieved it from all liability. (June 4, 1993 Letter from Counsel for the TENJ Fund to the Local 1262 Funds' Manager, Boas Aff.Exh. B.)[1] By letter dated June 4, 1993, defendant informed plaintiffs in no uncertain terms that "[s]ince TENJ does *not* cover Susan Armstrong, your fund provides sole coverage."[2] *Id.* (emphasis in original).

In order to avoid undue hardship to the claimants throughout the period of time in which the two funds debated their respective liabilities, the Local 1262 Funds paid the claimants' benefits, but advised the TENJ Fund that the payments were being made without prejudice to the Local 1262 Funds' right to proceed against and seek reimbursement from the TENJ Fund. (Boas Aff. ¶¶ 6–15, Exh. C & H.) The TENJ Fund seemingly agreed to pay secondarily, but again, *"without prejudice* to either party." (McCarthy Aff. ¶ 7, Exh. F.) To date, the Local 1262 Funds have paid a total of $266,-852.14 on the four claims in question. (Boas Aff. ¶¶ 4–15, Pls.' Mem. of Law in Supp. of Mot. for Summ.J. at 9 n. 7.) The TENJ Fund has paid approximately $15,764.48. (Def.'s Mem. of Law in Supp. of Mot. for Summ. J. at 11–12.)

On October 26, 1994, plaintiffs filed a five-count Complaint seeking a declaration that the defendant fund is primarily liable for the claims at issue and an order directing the defendant fund to reimburse plaintiffs for the monies they had paid to the claimants in the assumed role as the primary provider. Plaintiffs' Complaint rests almost exclusively on the argument that the provision of the TENJ Fund's plan in which it disclaims all liability if the beneficiary is covered by an independent reimbursement plan is an invalid "escape clause" that must be declared unenforceable. According to plaintiffs, once the alleged escape clause is read out of defendant's plan, the clear terms of both plans assign primary liability to the TENJ Fund. Defendant argues in its motion for summary judgment that its plan does not contain an escape clause, that plaintiffs' reimbursement plan is unenforceable as being violative of the policies underlying ERISA, and that the Local 1262 Funds, as the claimants' employers' plan, is primarily responsible for the claims.

## II. *Discussion*

Both the Local 1262 and the TENJ Funds are self-funded plans and, therefore, fall squarely within ERISA's definition of an "employee welfare benefit plan." 29 U.S.C. § 1002(1). Accordingly, they are governed exclusively by the broad statutory scheme that ERISA established and are exempt from state insurance regulations. *See FMC Corp. v. Holliday,* 498 U.S. 52, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990); *Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987). Unfortunately, however, ERISA does not contain a coordination of benefits provision and offers no explicit guidance as to how disputes involving conflicting coordination of benefits clauses are to be resolved. Left with these sorts of legislative "gaps" that plague ERISA, it has become incumbent upon the federal courts to develop a "federal common law of rights and obligations under ERISA-regulated plans."[3] *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 56, 107 S.Ct. 1549, 1558, 95 L.Ed.2d 39 (1987). *See also Northeast Dept. ILGWU Health and Welfare Fund v. Teamsters Local Union No. 229 Welfare Fund,* 764 F.2d 147 (3d Cir.1985) (recognizing that dispute over coordination of benefits not expressly addressed under ERISA is governed by federal common law); *PM Group Life Ins. Co.*

---

1. Although the June 4, 1993 letter refers only to the claims of Susan Armstrong, the claims of all four part-time employees have been treated collectively by the parties.

2. Interestingly, the TENJ Fund subsequently informed the Local 1262 Funds that the TENJ Fund considered itself to be "secondary" to plaintiffs' reimbursement plan. (Letter of August 31, 1993, Boas Aff.Exh. G.)

3. Because the case is one arising under federal common law, this court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. *See Northeast Dept. ILGWU Health and Welfare Fund v. Teamsters Local Union No. 229 Welfare Fund,* 764 F.2d 147, 159 (3d Cir.1985) (holding that the dispute there was "cognizable in federal court because it arises under the federal common law of ERISA related to employee benefit plans, which is part of the laws of the United States for the purposes of federal question jurisdiction under 28 U.S.C. § 1331").

*v. Western Growers Assurance Trust,* 953 F.2d 543 (9th Cir.1992) (relying on federal common law to resolve issue of conflicting "other insurance" provisions).

When interpreting provisions in competing ERISA plans,

'the judicial task is first to determine from the contracts themselves what obligations the respective obligor intended to assume and then to determine whether these intentions are compatible not only each with the other but also with the insured's rights and expectations and with the controlling demands of public policy.' ... In the ERISA context, courts should give effect to the intent of the trustees of the competing benefit plans, as evidenced by their incorporation of 'other insurance' provisions, if the provisions are compatible, unless doing so results in the enforcement of a provision that conflicts with the language or the policies of ERISA.

*Northeast,* 764 F.2d at 159 (quoting *Starks v. Hospital Serv. Plan of New Jersey,* 182 N.J.Super. 342, 351, 440 A.2d 1353 (App.Div. 1981)). Thus, this court's analysis must begin with an examination of the intent of the parties, as evidenced through the language of the parties' plan documents. If that examination reveals that the two plans are mutually repugnant, that is, that the court cannot simultaneously give effect to the *plain* language of both plans, this court then must resolve the conflict under the federal common law of ERISA-covered employee benefit plans.

**A. Defendant's Plan**

Turning first to the terms of the TENJ Fund's plan, it is obvious that the Fund did not intend to provide primary coverage for a member's dependent if that dependent is also a member of his or her own employer's plan. (Def.'s App. at 41 ("[i]n determining whether this Plan is primary for a spouse [or dependent] the following will apply: [t]he Plan covering the patient as an employee ... will be the primary plan").) It is equally clear that, if the dependent's employer's plan is a reimbursement plan, the TENJ Fund intended to afford no coverage whatsoever. *Id.* ("[t]his Fund does *not* afford coverage to a

participant's dependent who himself/herself is a participant in a Reimbursement or similar plan that affords coverage only if there is no other health/welfare coverage").

Plaintiffs argue that the latter provision quoted above is what is known in the insurance industry as an "escape clause." An escape clause is one which "provides for an outright exception to coverage if the insured is covered by another insurance policy." *Northeast,* 764 F.2d at 160. In *Northeast,* the United States Court of Appeals for the Third Circuit held that the inclusion of an escape clause in an ERISA-regulated plan represented an arbitrary and capricious judgment on the part of the plan's trustees in violation of the policies underlying ERISA. *Id.* at 163. Thus, the court enunciated the prospective rule that escape clauses are unenforceable as a matter of law. *Id.* at 164. In so holding, the court emphasized that,

"one very important policy underlying ERISA is that employees enrolled in a benefit plan should not be deprived of compensation that they reasonably anticipate under the plan's purported coverage. Escape clauses, however, risk just such a result.... [U]nlike plans with excess clauses, a plan with an escape clause does not provide participants who receive less in benefits from the other plan with the opportunity to return to the first plan for the difference. As a result, a participant of a plan with an escape clause, who thinks that he is covered by that plan and who expects to recover medical expenses with the terms of that plan, automatically loses his coverage in the presence of another insurance plan, even if the benefits he is entitled to receive under the other plan are much less favorable than those of his own." *Id.* at 163.

Pursuant to this straight-forward analysis, it is clear that the clause contained in the TENJ Fund's plan which provides that "[t]his Fund does *not* afford coverage to a participant's dependent who himself/herself is a participant in a Reimbursement or similar plan that affords coverage only if there is no other health/welfare coverage" is an unenforceable escape clause. As was the case in *Northeast,* a dependent beneficiary who is

also covered by his or her employer's reimbursement plan is afforded no coverage by the TENJ Fund, even if he or she stands to recover less from the employer's plan than he or she would have received from the TENJ Fund had the employer offered no insurance in the first place.

Defendant argues at length, however, that "in practice," it has not attempted to escape all liability but, rather, has paid secondary benefits after plaintiffs' paid primarily. (Def.'s Mem. in Supp. of Mot. for Summ.J. at 10.) This argument is belied by the evidence that defendant itself has submitted. By letter dated June 4, 1993, defense counsel quoted its escape clause and informed the Local 1262 Funds' manager that "[s]ince TENJ does *not* cover Susan Armstrong, your fund provides sole coverage." (Def.'s App. at 205 (emphasis in original).) Moreover, the fact that the TENJ Fund did eventually pay the claimants' secondary benefits is wholly irrelevant, as those payments were made solely to alleviate the burden on the claimants and were made expressly *without prejudice* to the rights of either party." [4] (5/26/95 Letter from Defense Counsel to Plaintiffs' Counsel, McCarthy Aff. Exh. F (emphasis in original).) Accordingly, having concluded that defendant's escape clause is unenforceable as a matter of law, this court will read that provision out of defendant's plan for the remainder of this opinion.

### B. *Plaintiffs' Plan*

Like the TENJ plan, the Local 1262 plan is clear on its face. The plan's plain language evidences the trustees' intent that where a part-time employee is also covered by one or more other plans, the Local 1262 plan would remain at all times "a Reimbursement plan which has its benefits determined after those" of the other plans and that "payments will be made after all other sources of coverage have been exhausted." (Kinsora Aff. Exh. A at 41.) This reimbursement provision is what is more commonly known in the insurance industry as an "excess" or "always secondary" clause. *See Northeast,* 764 F.2d at 160 ("[a]n excess clause purports to provide an insured with only secondary (or excess) protection when coverage from another insurance policy is available"). Thus, with respect to the claims of the four individuals underlying the case at bar, it is evident that the trustees of the Local 1262 Funds did not intend to provide primary coverage if the claimants were eligible for benefits from the TENJ Fund.

Defendant, citing *Northeast,* argues that, like an escape clause, plaintiffs' excess clause violates the policies underlying ERISA and should be declared unenforceable. Specifically, defendant contends that the Local 1262 Funds' excess clause "benefits no one but the contributing employers" and, like an escape clause, "fails to accord to participants their reasonable rights and expectations." (Def.'s Mem. in Supp. of Mot. for Summ.J. at 24.)

In *Northeast,* the fund's escape clause was held to be unenforceable because a participant who expected a certain amount of coverage could, in the end, receive far less in benefits than he or she reasonably would have anticipated. *Id.* at 163. This was true because, if other insurance was available, the escape clause rendered the other policy the claimant's sole coverage, regardless of whether the other policy provided benefits comparable to those offered by the plan con-

---

4. At oral argument, defendant's counsel expressly disavowed his earlier position that the TENJ Fund provided no coverage for the four claimants and that the secondary payments had been made without prejudice. He stated that he had simply been wrong, and that it had always been the intent of the trustees to provide secondary benefits once the employers' reimbursement plan paid primarily. Defendant has not argued that the TENJ Fund's trustees have been granted discretionary authority to grant or deny claims. Even if they had been, however, and this court's review of the trustees' actions were, therefore, limited to the highly deferential "arbitrary and capricious" standard, *see Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), there is no conceivable interpretation of defendant's plan, its amendments, or its conduct in this case that could support the position now advocated by defendant. In any event, defendant's reversal of position has no bearing on the outcome of this case. As will be discussed more fully below, once the escape clause is read out of defendant's plan, the plan can only be interpreted as providing secondary benefits once the claimants' employers have paid primarily.

taining the escape clause. *Id.* Thus, an escape clause could render unsuspecting beneficiaries victims of the paradox by which more insurance could often mean less coverage and the receipt of fewer benefits.

Unlike an escape clause, however, a reimbursement or excess clause cannot produce such unjust results. Where a beneficiary is covered by a plan containing an excess clause, he or she is guaranteed the maximum amount of benefits ordinarily available under the plan. Although a excess clause requires a claimant to exhaust another available insurance policy first, he or she can then return to exhaust the plan containing the excess clause if the maximum provided under the primary policy proved inadequate. Thus, because the beneficiaries of an excess plan are guaranteed to remain eligible for the maximum benefits allowable under both applicable plans, an excess clause cannot be deemed to inure only to the benefit of the employer. For the same reason, an excess clause does not violate the policy underlying ERISA that "employees enrolled in a benefit plan should not be deprived of compensation that they reasonably anticipate under the plan's purported coverage." *See Northeast,* 764 F.2d at 163. Accordingly, while reimbursement, excess or "always secondary" clauses are administratively unwieldy, this court cannot find that they violate the policies underlying ERISA and, therefore, can identify no legal basis for declaring them void as a matter of law. *Accord, Zalkin v. Teamsters Local 469 Welfare Fund,* No. 92 Civ. 477 (D.N.J.1993) (finding reimbursement clause to be enforceable as consistent with the policies enunciated in *Northeast* ); *Westra v. Employees of Agency Rent–A–Car Hosp. Assoc.,* 1993 WL 806425 (E.D.Mich.1993) (holding that excess provision in ERISA-regulated plan was valid and enforceable).

## C. *The Conflict*

██ Having construed the relevant provisions of the parties' plans, this court next must determine whether the intentions of the parties, as evidenced by the unambiguous language of their respective plans, are compatible with each other or whether they are mutually repugnant.[5] Not surprisingly, both sides contend that the plans are compatible and that the terms of each render the other primarily liable. According to defendant, although the Local 1262 Funds' excess clause directs the claimants to exhaust the benefits available under the TENJ Fund first, the TENJ Fund's escape clause negates any available coverage. Thus, as no other insurance is available, defendant argues that plaintiffs' excess plan must provide primary coverage. Thereafter, the claimants can return to the TENJ Fund for secondary coverage.

In addition to being internally inconsistent, defendant's argument rests entirely on its escape clause and cannot, therefore, prevail. Reading the escape clause out of defendant's plan, the relevant portion of the plan can be reduced to a single sentence: "[t]he Plan covering the patient as an employee or in which the employee is a participant ... will be the primary plan." (Def.'s App. at 41.) Thus, it is clear that, although the TENJ Fund cannot take advantage of its escape clause, the plan's plain language establishes that the fund is not primarily liable vis-a-vis the claimants' employers.

Likewise, the plain language of the Local 1262 Funds' plan evidences the trustees' intent not to provide primary coverage to its part-time employees when those employees are covered by another plan. Thus, the conflict between the two plans is self-evident. Both deny primary coverage and are willing to provide benefits in a secondary capacity only after the other accepts the responsibility of primary coverage.

Plaintiffs rely on *Starks v. Hospital Plan of N.J., Inc.,* 182 N.J.Super. 342, 440 A.2d 1353 (App.Div.1981) for the position that, because their "always excess" plan contemplates coverage only after all other insurance sources are exhausted, that intent must be given priority over the terms of a plan that provides secondary coverage. In *Starks,* the court was faced with a conflict almost identical to the one presented here. There, the individual claimants were employee-members

---

5. Given the unambiguous language of both plans, it is clear to this court that the trustees of both funds acted properly in denying primary coverage for the claims at issue.

of the Amalgamated Welfare Fund and were dependent beneficiaries of Blue Cross/Blue Shield. *Id.* at 347–48, 440 A.2d 1353. Like the Local 1262 Funds, the Amalgamated Fund was strictly a reimbursement plan. *Id.* And like the TENJ Fund, the Blue Cross/Blue Shield plan's coordination of benefits provision stated that if a member's dependent was covered by his or her own employer's policy, that plan would be primary. *Id.*

Unlike this court, however, the *Starks* court determined that the two plans were not mutually repugnant. *Id.* at 353–54, 440 A.2d 1353. That court found that because the Amalgamated Fund provided only excess coverage, its trustees clearly contemplated a tertiary role vis-a-vis any other secondary coverage provider. *Id.* Thus, it reasoned that "[w]here the two coverages are not, however, primary and secondary but rather secondary and tertiary, there being no primary coverage in the usual sense, the only rational result is to require the secondary coverage to pay first and the tertiary coverage to pay second." *Id.*

This court cannot accept the result in *Starks* for several reasons. First, as this case is controlled by federal common law, which the courts have been charged to develop in light of ERISA's broad preemption provisions, "it would make little sense to adopt a state law rule, which Congress has chosen to preempt, as a matter of federal common law." *PM Group Life,* 953 F.2d at 546. More importantly, however, this court simply disagrees with the *Starks* court's logic. Where there are only two applicable policies, and both disclaim primary liability under the unambiguous terms of their respective plans, the distinction between secondary and tertiary is wholly meaningless. In such a case, the conflict is not simply over the order of providing benefits in an abstract

sense but, rather, relates to the very concrete task of determining which policy will pay as *primary*.[6]

Phrased in general terms, the *Starks* court's analysis was that where one policy contemplates its benefits always being determined last when other coverage is available and the other plan will sometimes concede that its benefits can be determined before another plan although it explicitly does not do so in light of the particular conflict presented, the "always excess" plan naturally must prevail. Such a conclusion, however, is entirely arbitrary. The mere fact that the TENJ Fund is willing to provide primary coverage in some instances simply has no bearing, as a matter of contract interpretation, on the fact that it specifically denies primary coverage when a dependent beneficiary is covered by his or her own employer's insurance. The reality of the interpretive impasse in the case at bar is that plaintiff's plan denies primary coverage while defendant's plan specifically assigns primary liability to plaintiffs. Thus, relying solely on contract principles, neither plan's coverage can be triggered because neither plan is required, by its terms, to provide benefits as the primary insurer.

Moreover, the *Starks* court's conclusion that the relationship between secondary and tertiary liability is logically parallel to the relationship between primary and secondary liability defies the fiscal realities of the insurance industry. In the usual case, the difference between the relative liabilities of the secondary and tertiary providers will be minimal.[7] Indeed, where the claimant's primary coverage is adequate, neither the secondary nor the tertiary provider will pay anything at all. Conversely, the difference in the relative liabilities of the primary and secondary insurers is typically great. In the case at bar,

---

6. If this court were to assign primary liability to plaintiffs' reimbursement plan, it would frustrate its trustees' clearly expressed intent to have its benefits determined last. Conversely, if this court were to find defendant primarily liable, it would directly contravene that plan's explicit instruction that the claimants' employers' plan be primary. The latter option is, of course, exactly what the court did in *Starks*. To say that there was no conflict, then, i.e., that effect could be given to both plans as written, was disingenuous.

In reality, the court *resolved* the unavoidable conflict in the manner which, in that court's opinion, did the least amount of violence to the terms of the two policies.

7. That is, in all but the rare situation, the secondary provider will pay a relatively small sum, as compared to the primary provider, and the tertiary provider will pay nothing.

for example, the difference between being found primarily or secondarily liable for Ms. Armstrong's claims, alone, translates to a difference of almost a quarter of a million dollars for the respective funds. Further, in situations where the primary coverage is adequate, the primary provider may be required to pay its maximum allowable benefits while the secondary plan will pay nothing. Thus, where the trustees of both plans intended to provide only excess insurance in the context of a specific conflict, a court cannot deem one plan primary without shifting unanticipated costs to that plan and frustrating the intent of its trustees.

Finally, the *Starks* court found support for its conclusion in the National Association of Insurance Commissioners' (NAIC) Group Coordination of Benefits Model Regulation.[8] *Id.* at 355, 440 A.2d 1353. The Model Regulation provides that where a claimant is covered by two plans, one as an employee and the other as a dependent beneficiary, the employer's plan would be the primary plan. Had both insurers adopted this model provision, no conflict would have arisen. The conflict arose, then, because Blue Cross/Blue Shield had adopted the NAIC approach while the Amalgamated Fund assumed an "always excess" position. At the time *Starks* was decided, the Model Regulation also provided that where one plan adopted the model rule and the other remained excess, the complying plan should attempt to assume a secondary position, but if the non-complying plan refused to pay primarily, the complying would be required to do so. *Id.* at 355, 440 A.2d 1353 (quoting Proceedings of the NAIC, 1971, vol. I at 228, Guideline 7). Thus, because the Amalgamated Fund would not assume primary liability, the "good sense" of the Model Regulation convinced the court to assign the responsibility for primary coverage to Blue Cross/Blue Shield. *Id.*

Since that time, Guideline 7 of the Model Regulation has been amended so as not to reward the obstinacy of a non-complying "always excess" plan. Under the current regime, if the complying plan would be secondary under the Model Regulation, that is, covering the claimant as a dependent rather than as an employee, the ultimate liability of the complying plan will always remain secondary. (NAIC Model Regulation § 7B (1991)). As will be discussed more fully below, the NAIC's current position is better reasoned and is more consistent with the policies underlying ERISA than was its previous stance. This court agrees with the *Starks* court that while the NAIC Model Regulation is in no way binding, reference to it is appropriate. The court's reliance on an out-dated provision of the Model Regulation, however, cautions strongly against its application today.

Accordingly, this court reaches the inescapable conclusion that the two policies are mutually repugnant for the purposes of the conflict in which both plans concede liability in a secondary capacity, yet plaintiffs' excess plan denies primary coverage while defendant's plan specifically assigns primary liability to plaintiffs. As a result, the conflict cannot be forthrightly resolved by reference to the terms of the policies themselves. Rather, this court must draw on the extant body of federal common law and the underlying policies that have driven its development.

### D. *The Federal Common Law*

 Surprisingly, the resolution of the conflict in the case at bar presents a question of first impression in the federal courts.[9] That, however, does not give this court *carte blanche* to fashion a uniform federal rule out of whole cloth. Rather, "the common law decision making process is inherently incremental by nature; the very 'genius of the common law is that it proceeds empirically and gradually, testing the ground at every step.'" *PM Group Life*, 953 F.2d at 547 (quoting R. Aldisert, Logic for Lawyers 8

---

8. The Model Regulation is a non-binding set of guidelines developed and issued by the NAIC advocating uniform rules for the resolution of coordination of benefits disputes in policies governed by varying state insurance laws. In addition to having been adopted by most states, most self-funded ERISA plans also contain coordination of benefits provisions based on the NAIC's Model Regulation.

9. Neither party has been able to alert this court to a factually identical situation in any reported opinion.

(1989)). Thus, before charting new ground, it is appropriate to survey the landscape of the law of ERISA-regulated benefit plans as it currently exists.

In *Northeast,* the United States Court of Appeals for the Third Circuit avoided having to resolve a conflict between repugnant "other insurance" provisions by declaring one plan's escape clause to be unenforceable, thereby eliminating the conflict that the court otherwise would have faced. *Northeast,* 764 F.2d at 164. In a footnote, however, the court recognized that "other courts faced with incompatible 'other insurance' clauses have frequently declared the clauses to be 'mutually repugnant' and have held both insurers primarily liable for the insured's loss on a pro-rata basis." *Id.* at 161 n. 13 (citing 8A Appleman, Insurance Law and Practice § 4910 at 477). This statement is inapplicable to the relevant analysis in the case at bar. First, and most obviously, the statement is merely dicta in the purest sense of the word—for the court did not even indicate that it necessarily would have adopted the pro-rata rule had it been faced with two enforceable though incompatible clauses. Moreover, the Appleman treatise, the court's only citation, discusses only conflicts between state-regulated insurance policies and does not address such conflicts in ERISA-regulated plans. As this court will discuss more fully below, the policies underlying ERISA militate strongly against adopting the pro-rata rule referenced in *Northeast.* Finally, in the decade that has passed since *Northeast* was decided, significant changes in the insurance industry have caused doubt as to whether pro-rata apportionment can still be considered the prevailing regime.

Three federal courts of appeals have addressed the resolution of conflicting coordination of benefits clauses in ERISA-regulated plans. Two of those cases, however, involved disputes between an ERISA-regulated plan and a state-regulated insurance policy. In *Winstead v. Indiana Ins. Co.,* 855 F.2d 430 (7th Cir.1988), *cert. denied,* 488 U.S. 1030, 109 S.Ct. 839, 102 L.Ed.2d 971 (1989), the United States Court of Appeals for the Seventh Circuit was faced with a conflict between the coordination of benefits clauses in a claimant's ERISA-regulated health and welfare fund and an applicable no-fault automobile insurance policy regulated by Michigan law. After finding the two policies to be irreconcilable, the court, citing *Northeast,* affirmed the district court's decision to hold both insurers primarily liable on a pro-rata basis. *Id.* at 434. In so holding, the court stated that the district court's "solomonic apportionment of liability [was] not only in keeping with generally accepted notions derived from state common law, see Appleman and Couch, supra, but seems eminently fair and reasonable." *Id.*

More recently, on facts almost identical to those in *Winstead,* the United States Court of Appeals for the Sixth Circuit explicitly rejected the Seventh Circuit's approach. There, the court gave full effect to the ERISA-regulated plan, stating that "we cannot accept the Seventh Circuit's conclusion that a 'solomonic apportionment of liability' is appropriate.... [s]uch a result may be, as *Winstead* suggests, 'eminently fair,' but it accords insufficient weight to the policy considerations behind the enactment of ERISA." *Auto Owners Ins. Co. v. Thorn Apple Valley, Inc.,* 31 F.3d 371, 375 (6th Cir.1994). Critical to the court's conclusion was the premise that in adopting ERISA, "Congress sought to guard qualified benefit plans from claims, such as that advanced by Auto Owners, which have been expressly disavowed by the plans." *Id.* Thus, only by giving full effect to the ERISA-regulated policy could the court "comply with a primary goal of ERISA, which is to safeguard the financial integrity of qualified plans by shielding them from unanticipated claims." *Id.* In turn, such a rule of law would effect "[t]he underlying purpose of ERISA [which] is to protect the 'interests of participants in employee benefit plans and their beneficiaries.'" *Id.* (quoting 29 U.S.C. § 1001(b)).

Because *Auto Owners* did not involve two ERISA-regulated plans, the court's decision to give effect to the ERISA plan over the state-regulated insurance policy is inapposite to the case at bar. The court's policy analysis, however, is critically relevant. Whatever rule this court adopts, it must be one that

provides the requisite degree of certainty and predictability so as to shield ERISA-regulated plans from the impact of unanticipated and expressly disavowed claims.

The third court of appeals decision addressing conflicting coordination of benefits clauses in ERISA-regulated plans is that of the United States Court of Appeals for the Ninth Circuit in *PM Group Life Ins. Co. v. Western Growers Assurance Trust*, 953 F.2d 543 (9th Cir.1992). There, the court was faced with incompatible "other insurance" provisions in two self-funded ERISA plans. When the daughter of Jose and Maria Campos was born three months premature, the terms of both parents' employee benefit plans rendered each secondarily liable and the other primarily so. The mother's plan provided that, in all cases, the father's plan would be the primary insurer ("the gender rule"). The father's plan provided that the plan covering the parent whose birthday fell earlier in the calendar year—in this case, the mother's—was the primary plan ("the birthday rule").

Recognizing that ERISA was silent on the issue of conflicting "other insurance" provisions, the court first emphasized the need to fashion a uniform federal coordination of benefits rule. *Id.* at 547 ("uniformity enables employers 'to predict the legality of proposed actions without the necessity of reference to varying state laws'") (citing *Pilot Life*, 481 U.S. at 56, 107 S.Ct. at 1557–58). To do so, the court looked for guidance to, among other things, the NAIC's Group Coordination of Benefits Model Regulation. *Id.* The NAIC's Model Regulation, adopted by most though not all states, espoused the birthday rule. *Id.* Thus, due both to its widespread acceptance as well as its gender neutrality, the court adopted the birthday rule as the federal common law rule for resolving such conflicts among coordination of benefits provisions in ERISA-regulated plans. *Id.* at 548.

The foregoing examination of the federal common law relating to conflicting coordination of benefits provisions in ERISA-regulated plans reveals two approaches that could logically be applied to the conflict presented in the case at bar. The first would be for the court to find both plans primarily liable and order a pro-rata apportionment of the claims. The second would be to apply the relevant provision of the NAIC Model Regulation, provided that it is consistent with the policies underlying ERISA.

Over twenty years ago, leaders of the insurance industry realized that "[t]here is only one way to deal with the problem of duplication of coverage, and that is by having everyone follow the same rules with respect to the order of benefit determination. The alternative is chaos." Jack B. Helitzer, Coordination of Benefits: How and Why it Works, 4 Benefits Law J. 411, 413 (1991). Accordingly, beginning in 1971, the NAIC developed and issued its Group Coordination of Benefits Model Regulation. The Model Regulation is a comprehensive coordination of benefits scheme, which, if adopted by all employee benefit plans, would eliminate conflicts among the providers of duplicate coverage in virtually all cases. The section of the Model Regulation addressing employee/dependent conflicts provides that "[t]he benefits of the plan which covers the person as an employee, member or subscriber (that is, other than as a dependent) are determined before those of the plan which covers the person as a dependent...." NAIC Group Coordination of Benefits Model Regulation § 5B(1) (1991). That is, "[t]he plan covering the person as an employee pays benefits first. The plan covering the same person as a dependent pays benefits second." Helitzer at 415.

Reimbursement or "always excess" plans are not recognized under the Model Regulation. Jack B. Helitzer, former chairman of the Industry Advisory Committee to the NAIC Task Force on Coordination of Benefits, has articulated the reason for the NAIC's hostility toward reimbursement plans as follows:

> In some isolated instances, uninsured plans write their contracts so that they are excess or always secondary to all other plans. The stated intent is to save money, or "contain costs."

> * * * * * *

Whatever "good" reasons employers might have for wanting to be always sec-

ondary, they cannot escape the fact that the effort to do so will doom at least some of their employees to a double-secondary situation, in which the individual has double coverage and neither plan has the obligation to pay anything substantial. Responsibility for the resulting problem lies with the employer or plan that adopts a unique order of benefits determination rule, and not with the one who follows accepted practices.

\* \* \* \* \* \*

Some plans maintain an always-secondary position and offer to settle any dispute with any other plan following the NAIC model by splitting the covered expenses fifty-fifty. Although this may be a practical way to resolve the problem in order to prevent an innocent employee from being caught in the middle of a dispute between sophisticated insurers or plan administrators over an arcane and complex coordination of benefits provision, it has the disadvantage of rewarding a renegade plan for using a nonconforming plan.

Helitzer at 421–22.

To combat the problem of the noncomplying, always-secondary plan, the Model Regulation has devised a system by which the noncomplying plan would be deemed the primary plan. Model Regulation § 3G(1). Should the noncomplying plan refuse to accept primary liability, the complying plan would pay its benefits in a secondary capacity *first,* thereby shifting the larger "primary" payment back to the excess plan. Model Regulation § 7B(2). If the excess plan still refuses to pay, the complying plan would advance full payment to the insured and would obtain a right of subrogation against the noncomplying plan. Model Regulation § 7B(3).

Twenty-four states have adopted the NAIC's approach. Helitzer, State Adoption of Coordination of Benefits Rules, 4 Benefits Law J. 435, 443 (1991). In those states, then, if a reimbursement plan refuses to accept the responsibility of primary liability at the outset, it can eventually be forced to do so by

law. Thirteen other states have adopted the Model Regulation's "employer first" provision, but have not yet codified the related right of subrogation. *Id.*

In addition to having met with wide-spread acceptance among the states, the Model Regulation has been similarly well received in the insurance industry and has been incorporated into most self-insured employee benefit plans. Significantly, both plans currently before the court have adopted the Model Regulation to govern employee/dependent conflicts with regard to coverage for their full-time employees. Moreover, even with respect to their part-time employees, the Local 1262 Funds will coordinate their reimbursement plan with the part-time employee's dependent coverage provider if that plan is also a reimbursement plan. (Def.'s App. at 99, Kinsora Aff. at 57–59.) In such a case, the Local 1262 Funds typically will agree to follow the Model Regulation and pay primary benefits for its own employees.[10] *Id.*

■ In fashioning a federal common law rule for the coordination of benefits in ERISA-regulated plans, this court must adopt a rule that comports with ERISA's underlying policy of providing uniformity, certainty and predictability for both plan beneficiaries and their trustees. *See Auto Owners Ins. Co.,* 31 F.3d at 375; *Northeast,* 764 F.2d at 163. Obviously, the adoption of any rule, whatever it may be, would lend uniformity to the law governing ERISA-regulated plans. Choosing the pro-rata apportionment rule, however, would sacrifice the certainty and predictability afforded by the NAIC's "employer first" rule by lending an undue degree of recognition to "always excess" plans. When the United States Court of Appeals for the Third Circuit declared escape clauses unenforceable, it expressed its concern that,

> even a qualified endorsement of escape clauses might encourage benefit plans with excess or coordination of benefits clauses to replace such clauses with those of the escape variety in order to 'fight fire with

---

**10.** The Local 1262 Funds and the TENJ Fund did not reach such an agreement in this case because neither considered the TENJ Fund to be a reimbursement or "always excess" plan in the sense that the parties considered the Local 1262 Funds' plan to be.

fire.' A war between plans would cause uncertainty in the industry and could potentially catch participants and beneficiaries in the crossfire.

*Northeast,* 764 F.2d at 164 n. 17.

In the case at bar, the application of the pro-rata rule would lead to the same race-to-the-bottom in the context of reimbursement provisions. Helitzer at 421–22. Under a pro-rata regime, a plan that incorporated the NAIC's "employer first" provision would be primarily liable for the claims of its own employees and fifty percent liable for the claims of its employees' dependents. In order to avoid such unjust results, all plans would have no choice but to adopt reimbursement plans for themselves. Once the race to the bottom was complete, the certainty and predictability offered by a coherent and systematic approach for the coordination of benefits would be lost. In such a regime, each plan, while intending to remain excess in a particular situation, could at any time be forced to pay far more in benefits than it had anticipated for a given claim. As such, one of the primary goals of ERISA, that of "safeguarding the financial integrity of qualified plans by shielding them from unanticipated claims," would be severely jeopardized.[11]

▮▮▮▮ Finally, plaintiffs argue that if they are forced to provide primary coverage for part-time employees, the financial burden on the plan would be unbearable. Thus, they continue, if this court adopts the NAIC's "employer first" coordination of benefits rule, it will be unable to provide any benefits whatsoever to its part-time employees. Even if that is true—and this court has no

great confidence that it is—extending coverage for a particular class of employees is not an appropriate concern for this court. Under ERISA, employers are not required to offer health and welfare benefits to their employees. *Nazay v. Miller,* 949 F.2d 1323, 1329 (3d Cir.1991) ("[i]n enacting ERISA, Congress did not impose a duty on employers to provide healthcare or other benefits to their employees"). Rather, ERISA merely mandates that, where an employer does provide benefits through a self-funded plan, the plan and its administration must comport with ERISA's requirements so as to ensure the fund's financial stability. Because the concept of universal coverage is not a policy underlying ERISA, this court has no authority to pursue that goal when fashioning the federal common law. In today's climate, when universal health care coverage is at the forefront of the nation's political agenda, the decision to actively pursue that goal must emanate from Congress. Until such time as it does, federal courts must remain careful not to permit such extra-legislative concerns to become part of the federal common law of ERISA by judicial fiat alone.

▮▮▮ This court is convinced that the adoption of the NAIC's "employer first" rule is consistent with both accepted industry practice and the laws of a majority of states. Further, its adoption more fully effectuates the policies underlying ERISA than would resort to the less predictable rule of pro-rata apportionment. This court will, therefore, adopt the NAIC's "employer first" rule as the federal common law rule governing the coordination of benefits among ERISA-regu-

---

11. Plaintiffs contend that this court should adopt neither the NAIC's Model Regulation nor the rule of pro-rata apportionment. Rather, plaintiffs argue that this court should follow the holding in *Zalkin v. Teamsters Local 469,* 92 Civ. No. 477 (D.N.J.1993), where the court determined that a plan containing the NAIC's "employer first" provision was primarily liable for a claim brought by a dependent beneficiary who was a part-time employee covered by the Local 1262 Funds' excess plan. That case, however, is wholly inapposite to the case at bar. In *Zalkin,* only the Local 1262 Funds' plan was governed by ERISA. The defendant plan was subject to regulation under New Jersey law. Thus, the court expressly rejected the application of federal common law. *Id.* at 17 n. 9. Instead, the court applied the law

of New Jersey, one of the minority of states that has refused to adopt the Model Regulation and continues to require the complying plan to pay primarily if the noncomplying plan is unwilling to do so. *Id.* at 18. Accordingly, the court concluded that, *under New Jersey law,* it was compelled to find the complying plan primarily liable. *Id.* at 19. Clearly, then, *Zalkin* has no precedential value in a case controlled by federal common law. Moreover, it would be irresponsible for this court to adopt the *Zalkin* approach as a matter of federal common law as a result of the mere happenstance that this case was brought in the District of New Jersey when New Jersey's minority rule does not effectuate the policies underlying ERISA.

lated plans: when a claim is covered by two ERISA-regulated plans, one covering the claimant as an employee participant and the other covering the claimant as a dependent beneficiary, the plan covering the claimant as an employee will have its benefits determined before the plan covering the claimant as a dependent and will be primary vis-a-vis the plan providing dependent coverage.

### III. Conclusion

For the reasons stated above, this court will deny plaintiffs' motion for summary judgment, will grant defendant's motion for summary judgment to the extent that it seeks a declaration of plaintiffs' primary liability, and will dismiss plaintiffs' complaint. In addition, this court will declare plaintiffs' funds to be primarily liable and defendant's fund to be secondarily liable for the claims of Susan Armstrong, Karen Iler, Esther Owens and Patricia Kelly. An appropriate order will issue.

### ORDER

This case having come before the court on the parties' cross-motions for summary judgment pursuant to Fed.R.Civ.P. 56(c); and consistent with this court's opinion of even date,

IT IS on this 29th day of April, 1996

ORDERED that plaintiffs' motion be and hereby is denied, except to the extent that it seeks a declaration of the invalidity of defendant's escape clause; and it is further

ORDERED that defendant's *motion* be and hereby is granted to the extent that it seeks a declaration of plaintiffs' primary liability; and it is further

ORDERED that defendant's escape clause be and hereby is declared unenforceable and void; and it is further

ORDERED that plaintiffs be and hereby are declared primarily liable and defendant be and hereby is declared secondarily liable for the claims of Susan Armstong, Karen Iler, Esther Owens and Patricia Kelly; and it is further

ORDERED that plaintiffs' complaint be and hereby is dismissed.